**Not for Publication in West's Federal Reporter -
Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals

## For the First Circuit

No. 02-1811

UNITED STATES OF AMERICA,

Appellee,

v.

CHARLIE WEBB,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin and Porfilio,[*] Senior Circuit Judges.

Syrie Fried, Assistant Federal Public Defender for appellant.
John T. McNeil, Assistant Attorney General, with whom Dina Michael Chaitowitz, Assistant Attorney General, was on the brief for the United States.

June 17, 2003

---

[*]Of the Tenth Circuit, sitting by designation.

**PORFILIO, <u>Senior Circuit Judge</u>**.    Charlie Webb was convicted by a jury of being a felon in possession of a firearm and sentenced to a term of 288 months.    His appeal presents three issues relating to the district court's discretionary questioning of the venire and instruction of the jury.    Finding no abuse of discretion, we affirm.

Responding to a call about a disturbance at the Orchard Park housing project in Boston, Officers Lewis and McCarthy observed a man and a woman, whom they later discovered were Defendant Webb and Eugenia Gillenwater, standing near the intersection of Zeigler Street and Wheatly Way.    The couple seemed to be arguing, so Officer McCarthy turned the police vehicle around and stopped, pointing the headlights directly on Webb and Ms. Gillenwater.

Officer McCarthy got out of the vehicle and walked toward Defendant.    As he neared, Officer McCarthy noticed Webb holding a large, shiny, silver-colored metallic object.    Continuing to approach, McCarthy saw Webb look at him, turn towards Gillenwater, and drop the object into the front of her pants.    Although Officer Lewis' view was somewhat obscured, he also saw Webb turn to Gillenwater and motion with both his hands toward her waist.

Even though the events occurred after dark, the scene was well-lighted by an overhead street lamp as well as other ambient

light from the complex. Most of the illumination, however, was provided by the headlights of the officers' vehicle.

Officer McCarthy seized Webb, and Officer Lewis approached Gillenwater and removed a loaded 9mm semi-automatic pistol from her waistband. Both were then placed under arrest.

At trial, Ms. Gillenwater, telling a more robust story, testified she felt Webb place a heavy object in the front of her pants after she noticed McCarthy heading toward her and Webb. She also stated that when she tried to warn Webb before the officers' vehicle stopped, he said, "f*** them polices.[sic] If they come over here I'll shoot them bitches."

The defense vigorously cross-examined the officers over a suggested discrepancy between their testimony and their written report. The officers testified the encounter was under the street lamp at 117 Zeigler, but the report stated it occurred in front of 111 Zeigler. Defendant suggested the change occurred when the officers discovered the street lamp was at 117. They explained, however, they took no contemporaneous notes at the scene, and Officer McCarthy was unable to account for why he wrote 111 and not 117. The only testimony on Defendant's behalf came from two women whose evident purpose was to impeach the veracity of Ms. Gillenwater.

## I. VOIR DIRE ON ATTITUDES TOWARD BLACKS

Defendant argues the district court refused to ask the venire a question about possible bias. Counsel requested that the court inquire:

> The defendant in this case is black/African American.
>
> Does the fact that he is black make you think it is more likely that he is guilty of the crime he is charged with here today?

The court declined, relying instead upon less specific questions crafted to solicit responses indicating wider potential bias. For example, the court asked,

> Are any of you sensible of any bias or prejudice whatsoever with respect to the case to be tried? Do any of you know any reason why you do not stand indifferent to this case?
>
> Do any of you know any reason why you ought not be called to sit as jurors in this case?

Although the court directed all the parties to stand at the outset of voir dire and the prospective jurors were aware Defendant is black, he contends these measures were insufficient. Because two of the three government witnesses were white, counsel argues the court's refusal to ask the specific question about racial bias resulted in Defendant's inability to determine whether racial prejudice would affect the jury. Thus, Defendant was left without an adequate basis upon which to exercise his peremptories and challenges for cause.

Defendant first relies upon <u>Rosales-Lopez</u> v. <u>United States</u>, 451 U.S. 182, 190-91 (1981), in which the Court instructed,

> In the federal court system, we have indicated that under our supervisory authority over the federal courts, we would require questions directed to the discovery of racial prejudice be asked in certain circumstances in which such an inquiry is not constitutionally mandated.

(citation omitted).  He cites other cases relating to the proper role of voir dire in removing prospective jurors who will not be able to be impartial and the necessity to uncover biases that would justify their exclusion.  He adds, in this case, questioning about racial bias was necessary to accomplish the task.  Indeed, there was a potential for white against black bias in Gillenwater's testimony indicating "a threat of violent conduct by a black man directed against white police officers."

The government responds the court did not err because its "inquiry probed potential racial and other prejudice in a manner at least as likely to reveal such bias or prejudice as would the question about race that Webb had requested to be asked at voir dire."  The prosecution maintains that the venire, which had been introduced to Webb at the outset, could see he is black.  Thus, the government urges, the court's questions about *any* prejudice, "coupled with its instruction that members of the venire should answer in the affirmative even if they 'may' or 'might' harbor such prejudice, were more than sufficient to probe the racial animus of potential jurors," citing <u>United States</u> v. <u>Brown</u>, 938 F.2d 1482,

-5-

1485-86 (1st Cir. 1991)(the mere fact a defendant is black does not trigger a need for a special question). The court's repeated general questions about possible bias and its instruction to respond if there was a possibility of bias in a potential juror's mind were sufficient, the government argues. After all, it notes, as the Court observed in <u>Rosales-Lopez</u>, there is "little reason to believe" a potential juror who did not respond to a general question on possible bias "would have answered affirmatively a question directed narrowly at racial prejudice." 451 U.S. at 193 n.8.

This issue must be judged under an abuse of discretion standard in which trial courts are given wide latitude. <u>Brown</u>, 938 F.2d at 1485. "The trial judge's function at this point in the trial is . . . to reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor, evidence and responses to questions." <u>Rosales-Lopez</u>, 451 U.S. at 188 (citations omitted). Therefore, a reviewing court, in recognition of this role, confers great latitude upon the trial judge's choice of questions. Moreover,

> "[a]buse of discretion" is a phrase which sounds worse than it really is. All it need mean is that, when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.

<u>Schubert</u> v. <u>Nissan Motor Corp</u>, 148 F.3d 25, 30 (1st Cir. 1998)(quoting <u>In re Josephson</u>, 218 F.2d 174, 182 (1st Cir. 1954)). Judged in this light, we are hard pressed to find any abuse of discretion here. As the Supreme Court has instructed:

> In our judgment, it is usually best to allow the defendant to resolve this conflict by making the determination of whether or not he would prefer to have the inquiry into racial or ethnic prejudice pursued. Failure to honor his request, however, will be reversible error only where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury.

<u>Rosales-Lopez</u>, 451 U.S. at 191 (footnote omitted).

Nevertheless, we recognize the importance of Mr. Webb's concern. Doubtless, it was the district court's motivation to protect Defendant against possible racial contamination of the jury's deliberations by suggestion. Yet it was, after all, Defendant's obvious choice. He must have assumed the potential reward was worth the risk his question posed. The inquiry he offered was appropriate and without an inflammatory purpose. Even though it was not an abuse of discretion to refuse to ask that question, the court could have asked it without harm. <u>Brown</u>, 938 F.2d at 1485. "[T]he wiser course generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant." <u>Id</u>. (quoting <u>Ristaino</u> v. <u>Ross</u>, 424 U.S. 589, 597 n.9 (1976)).

## II.  VOIR DIRE ON OFFICER CREDIBILITY

Defendant postulates the district court erred by not asking the venire this question:

> Police officers will be testifying as witnesses in this case.  People who are not police officers will also be testifying in this case.  Would you be more likely to believe the testimony of a police officer simply because he or she is a police officer?

Defendant relies upon United States v. Victoria-Peguero, 920 F.2d 77 (1st Cir. 1990), to support his argument that the First Circuit, like others, holds it is error for the trial judge to refuse to question the venire about whether it would give extra credence to law enforcement witnesses.  To make the determination of whether the failure to inquire is reversible error, Defendant adds that courts consider: (1) the importance of the law enforcement officer's testimony to the case as a whole; (2) the extent to which a venire person's attitude toward law enforcement is covered in other questions on voir dire and the general charge; (3) the extent to which the officer's credibility is put to issue; and (4) the extent to which the officer is corroborated by other non-officer's testimony.  In support, he cites United States v. Anagnos, 853 F.2d 1, 3 (1st Cir. 1988)(citing United States v. Baldwin, 607 F.2d 1295, 1297-98 (9th Cir. 1979)).

Defendant contends the testimony of the arresting officers was critical; indeed, he points out, the government argued to the jury it could convict on that testimony alone.  Defendant asserts he

vigorously sought to impeach the officers. Specifically, he urges, he questioned Officer McCarthy's ability to see an object in Defendant's hands which he claimed ended up in Ms. Gillenwater's clothing. Defendant further focused his credibility attack on the change in the address recorded from 111, where there was no street lamp, to 117 Zeigler Street, where there was a street light. Defendant exacuates the importance of Officer McCarthy's testimony by reminding that jurors sent a note asking whether the couple was actually located under the lamppost. Hence, he argues, "the court did not specifically instruct the jury to treat the testimony of police officers in the same way they would treat the testimony of any other witness, nor did it caution them not to give extra credence to their testimony. Indeed, the court's final instructions did not single out the testimony of the police officers for any special mention at all."

The government responds the district court determined whether any venire person had any connection with law enforcement. For those who did, the court examined them at side-bar about their potential for bias. The government argues at least five circuit courts have determined that this process sufficiently ferrets out pro-law enforcement bias. Moreover, this approach comports with this court's holding that when law enforcement testimony is important to the government's case, the district court "should ordinarily inquire into whether prospective jurors are more likely

to credit [police officers'] testimony." <u>United States</u> v. <u>Pappas</u>, 639 F.2d 1, 4 (1st Cir. 1980).

The government adds whether the failure to ask specific questions is reversible error depends in part upon the extent to which the credibility of the government agent's testimony is put into issue. <u>Id</u>. at 5. Here, the discrepancy between the officers' testimony and the written report was irrelevant. It was unquestioned that the encounter took place at the intersections of Zeigler and Wheatly Way; but, more importantly, all agreed that the lights from the police vehicle were shining directly on Defendant and Ms. Gillenwater as the officers emerged. Thus, the attempted impeachment was based upon an insignificant discrepancy — whether the parties were under the street light did not affect whether the officers could observe Mr. Webb. Finally, we are reminded, in its general charge, the court instructed the jury to treat all witnesses alike.

The government's position is well taken. Once again, judging this issue under the abuse of discretion standard, we find no abuse. Although the officers' testimony was important, it was corroborated by Ms. Gillenwater. Moreover, the attempt to impeach them fell short of a critical evidentiary issue. Judged in light of the entire record, the variance between the address stated in the testimony and that included in the written report did not suggest the officers were not credible. Finally, the jury was told in the

general charge that the testimony of one witness was not entitled to greater credibility than that of any other.

The lack of abuse of discretion notwithstanding, we remain curious why the court did not eliminate the issue at the outset. The court's method of probing the issue was certainly more complicated than simply asking the question proposed by the defense. True enough, the court was able to discover persons who might have harbored police bias. After that discovery, the court pursued questioning which probed the essence of disclosures Defendant sought. The court's general charge was also sufficient to emphasize the jury could not give the officers more credibility than it gave to the remaining witnesses. But, any doubt and an appellate issue could have been eliminated by simply asking the question the defense solicited. A salutary result could also have been achieved.

By asking the question, Defendant's major concern could have been alleviated. He posits that a potential juror might have been reared to respect police authority. If so, that person might believe because of their position, officers are entitled to greater credibility than others. If the proposed question had been asked, Defendant maintains, such a person could have been alerted to explore his conscience for a previously unrecognized bias. Unfortunately, this sort of self-examination was not suggested by any of the questions posed by the court.

## III.  INSTRUCTION ON DEFENDANT'S RIGHT NOT TO TESTIFY

Relying upon Carter v. Kentucky, 450 U.S. 288 (1981), Defendant argues the district court erred by not instructing the jury it should draw "no adverse inferences" against him because he did not testify.  He declares counsel "requested that the jury be charged regarding the defendant's constitutional right not to testify."  Admitting counsel did not use the language "no adverse inference" in her request for the instruction, Defendant, nonetheless, insists he "adequately invoked his substantive right to jury guidance."

The government puts it another way: "Webb never requested the 'adverse inference' language at trial in any form." Furthermore, even if the court's failure to grant the instruction Defendant desired was error, "the error was not plain, as it is reflected in the fact that defense counsel was unable to articulate the problem with the instructions when the court had completed giving them."

In varying ways, the court instructed several times that Defendant had no duty to take the stand and did not have to testify. For example, part of the charge was:

> Mr. Webb started this case innocent . . .
>
> He has no obligation to explain anything or say anything or do anything.  He doesn't have to take the stand.  He doesn't have to testify.  And you cannot hold against him anything that wasn't done.  That would turn the whole process on its head.  The government

-12-

made this charge. The government's got to prove the charge beyond a reasonable doubt.

* * *

First of all, there's that great principle, and it is a great principle, that Mr. Webb started out the trial innocent. Just remember he didn't have to do a single thing in this case. He can't be brought in here and made to explain things he doesn't have to . . . . you cannot ever hold it against him that he's here in court.

The government argues although the court did not use the specific words, "no adverse inference," the charge contained their "functional equivalent." More importantly, Defendant did not object to the instructions as given, nor did counsel request a specific instruction, suggesting only: "I think it's appropriate that the jury be instructed it's the defendant's right not to testify."

We believe this issue is foreclosed to Defendant by Fed. R. Crim. P. 30. Defendant's failure to object to the instructions given, stating "distinctly the matter to which that party objects and the grounds of the objection," precludes the assignment of error. United States v. Arthurs, 73 F.3d 444, 447-48 (1st Cir. 1996). Were this not so, we would still be constrained to conclude the failure to respond directly to Defendant's request was not erroneous because the instructions as a whole certainly informed the jury of Defendant's right not to testify and that no inferences could be drawn by the jury from his not doing so. United States v. Woodward, 149 F.3d 46, 68-69 (1st Cir. 1999). Moreover, in light of

-13-

the overwhelming evidence of guilt, Mr. Webb cannot show the instructions given "seriously affect[ed] the fairness, integrity or public reputation of the judicial proceedings."  <u>United States</u> v. <u>Brand</u>, 80 F.3d 560, 567 (1st Cir. 1996)(quoting <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 736 (1993)).

**<u>Affirmed</u>**.