# United States Court of Appeals
## For the First Circuit

No. 10-2340

UNITED STATES OF AMERICA,

Appellee,

v.

PATRICK J. GELIN,

Defendant, Appellant.

No. 10-2486

UNITED STATES OF AMERICA,

Appellee,

v.

MICHELINE LAMARRE, a/k/a MICHELINE CHAMPAGNE,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, <u>U.S. District Judge</u>]

Before

Lynch, <u>Chief Judge</u>,
Torruella and Boudin,[*] <u>Circuit Judges</u>.

---

[*] Judge Boudin heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's opinion in this case. The remaining two panelists therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

Rudolph F. Miller, for appellant Gelin.

Nathalie R. Castor, for appellant Lamarre.

Daniel Steven Goodman, Assistant United States Attorney, Criminal Division, Appellate Section, with whom Carmen M. Ortiz, United States Attorney, James E. Arnold, Assistant United States Attorney, Lanny A. Breuer, Assistant Attorney General, and John D. Buretta, Acting Deputy Assistant Attorney General, was on brief for appellee.

_____

April 1, 2013

_____

**TORRUELLA, Circuit Judge.** Following a jury trial, Defendant-Appellants Patrick J. Gelin ("Gelin") and Micheline Lamarre ("Lamarre") were each convicted under 18 U.S.C. §§ 1347 and 1349 for making fraudulent claims to, and obtaining payment from, insurance companies participating in Massachusetts' no-fault automobile insurance program.[1] They appeal their convictions, arguing first that the district court erred in ruling that the defrauded insurance companies constituted "health care benefit programs" within the jurisdictional reach of § 1347. Gelin and Lamarre also argue that the district court (1) erred in concluding that their scheme affected interstate commerce as is required for a constitutionally valid application of § 1347; and (2) abridged their Fifth and Sixth Amendment rights in denying proposed voir dire questions concerning the ethnic minority group to which they belong. Finding no error by the district court, we affirm.

## I.  Background

Gelin was the owner of Premium Care Physical Therapy ("Premium"), a physical therapy clinic in Brockton, Massachusetts. Lamarre worked as an "on-call" physical therapist at Premium and was generally present at the clinic on Mondays and Wednesdays. The

---

[1] Under Massachusetts law, everyone who registers a vehicle in the state is required to have insurance coverage that pays for the reasonable and necessary medical services that could arise in connection with insured vehicle accidents, regardless of fault. Mass. Gen. Laws ch. 90, § 34M.

sequence of events leading up to Gelin and Lamarre's convictions follows.

In April 2002, Gelin hired Sharon Little ("Little") as the marketing director for Premium. Little was responsible for bringing new patients to Premium and for getting the clinic into better functioning order. Eventually she also became Premium's manager and Gelin's assistant, helping him with the billing of insurance companies for treatments provided to clinic patients. While discharging those duties, Little stumbled onto patient charts indicating that Lamarre treated patients on days when Little knew Lamarre was not at the clinic. When Little asked what was going on, Gelin told her that Premium was submitting fraudulent charges to insurance companies with the help of Lamarre. According to Little's testimony, Gelin and Lamarre would submit fraudulent claims to providers of Massachusetts' no-fault automobile insurance and request payment for physical therapy that they never rendered. If the fraudulent claims were paid, Lamarre would receive up to 15% of the proceeds as a commission for her participation in the scheme, and Gelin would keep the rest.

Between 2003 and 2004, Little heard Gelin instruct Lamarre to "finish off" charts more than 20 times. She also saw Lamarre forging patient charts that Gelin had given her, and saw Gelin forging injury claim application forms on behalf of patients. When Little protested to Gelin about their need to forge charts

-4-

given Premium's success, he responded that she was overreacting to "a little white-collar crime" and told her not to worry about it. Lamarre later told Little that the submission of fraudulent claims was Gelin's idea, and while she was not happy with it, she did need the extra money to pay off her student loans.

Little testified that Gelin eventually concluded that she could not be trusted to keep quiet about Premium's billing practices. He therefore hired a "general chief manager" and instructed him to keep an eye on Little. By August 2004, Little had had enough and told Gelin that she would not do "this illegal shit" anymore, walked out of the office, and "never went back." Sometime thereafter Little informed the National Insurance Crime Bureau about the fraudulent scheme at Premium.

Gelin and Lamarre were each indicted on nine counts of health care fraud, § 1347, and one count of conspiracy to commit health care fraud, § 1349. During the voir dire, Gelin's counsel requested that the court pose the following question to the venire: "Patrick Gelin is a black Haitian-American. Do you have any feelings about black Haitian-Americans or any other minority group that might affect your ability to sit as a fair and impartial juror in this case?" Lamarre, also a Haitian-American, joined Gelin's request, advancing concerns regarding the racial overtone of evidence the government intended to introduce at trial. Specifically, Gelin and Lamarre pointed to Little's deposition

testimony, where she used derogatory terms to refer to Gelin's Haitian background and made reference to voodoo and witch doctors. She also referred to Gelin as the godfather of the Haitian community.

The government did not object to the voir dire question but stated that it was unnecessary, even though it anticipated that Little would offer testimony concerning Gelin's statement that his fraudulent activity was a "white person's crime," and that he was "not doing what [African-Americans] do, selling drugs in the street." The government also admitted that it would introduce testimony of former employees who would state that Gelin treated African-Americans differently than people from the Haitian community.

The district court refused to pose the voir dire question, stating that it was not aware of "anything in the facts of the case that would suggest any potential for racial bias to be a prominent feature of the case." The court also stated its view that defense counsel "vastly overstated the danger of racial bias in an average jury in 2010" and "presume[d] the existence of racial bias in jurors the way we might have 50 years ago, maybe 25 years ago." But in present times, the court then added, "we have to acknowledge, I think, the reality of social progress. So it is -- just as a general matter against a social background that there's no need to inject the issue into the case."

-6-

Nevertheless, the court did emphasize to the venire the need for a jury "that is composed of people who are completely fair-minded and impartial as to the parties involved in the case and as to the issues presented." It followed up with specific inquiries about whether any juror was employed by law enforcement or insurance companies, and whether any of them had been the victim of fraud or other crimes. The court also asked potential jurors whether they had "any personal belief, attitudes, experiences, potential biases that would interfere with [their] ability to be a fair-minded and impartial juror in this case."

At trial, the government introduced 16 witnesses, including Little, several patients whose treatment charts Little had identified as containing false entries, employees from the defrauded insurance companies, several of Premium's employees, and an FBI agent. Some of the witnesses testified that Gelin and Lamarre had documented therapy sessions with car accident victims when the patients were not in Massachusetts or when Lamarre, who signed off on the treatments, was not in the clinic. For example, one of the government's witnesses testified that Premium had submitted a claim for 30 treatment days "provided" during a period of time in which he was away attending college in Iowa.[2] Furthermore, one of Premium's physical therapy assistants testified

[2] The government's brief describes similar trial testimonies from at least four of Premium's "patients."

-7-

that the charts reflecting treatments supposedly administered by Lamarre were not consistent with the days that Lamarre actually worked at the clinic. Another of Premium's employees testified that Gelin told her about his agreement with Lamarre concerning fraudulent charts and excessive billing.

The government also presented evidence regarding Premium's transactions with the insurance companies themselves, some of which were located outside Massachusetts and did business nationally. This evidence included, for example, the testimony of insurance company representatives that their policies provided benefits for health care services rendered anywhere in the United States, not only within Massachusetts. Additionally, it included the insurance policies themselves, which confirm that they covered both in- and out-of-state accidents. The government also introduced several checks drawn on banks located in different states as evidence of payments made by insurance companies to Premium on account of fraudulent claims. Further, the government introduced evidence showing Premium's use of the United States Postal Service to mail fraudulent claims to the insurance companies.

The jury returned guilty verdicts on all but two counts. Gelin and Lamarre then moved for acquittal, arguing that the government had failed to establish that the defrauded insurance companies were "health care benefit programs" as required for a

conviction under § 1347.  The district court initially denied Gelin and Lamarre's motion without explanation, but following post-trial briefing, rejected their claims by agreeing with the government's arguments that the court should adopt the reasoning of a Second Circuit decision, United States v. Lucien, 347 F.3d 45, 50-52 (2d Cir. 2003), which held that an automobile insurance contract that provides for the reimbursement of medical services plainly meets the statutory definition of a "health care benefit program" under § 1347.  Gelin and Lamarre also raised a sufficiency of the evidence claim, arguing that the government failed to show that their fraud had affected interstate commerce as required under the statute.  The district court also rejected that claim, entering the final judgments on appeal now.

## II.  Discussion

### A.  The Statutory Interpretation Challenge

We begin with Gelin and Lamarre's contention that the district court incorrectly determined that the defrauded insurance companies were "health care benefit programs" under § 1347.  Because the analysis of such a claim involves statutory construction, we apply de novo review.  United States v. Troy, 618 F.3d 27, 35 (1st Cir. 2010).  The starting point of our inquiry is the text of the statute itself, "and 'if the meaning of the text is unambiguous our task ends there as well.'"  Mass. Museum of Contemporary Art Found., Inc. v. Buchel, 593 F.3d 38, 50 (1st Cir.

2010) (quoting United States v. Godin, 534 F.3d 51, 56 (1st Cir. 2008)).  When interpreting an unambiguous statute, however, we may also resort to legislative history to corroborate "that the statute's plain meaning does not lead to absurd results."  In re Rudler, 576 F.3d 37, 44-45 (1st Cir. 2009) (citing Lamie v. United States, 540 U.S. 526, 534 (2004)).

The relevant statutory provision in this case is 18 U.S.C. § 24(b), which defines the term "health care benefit program" for purposes of § 1347 as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."[3]

---

[3]  As stated previously, § 1347 sets forth one of the offenses for which Gelin and Lamarre were convicted:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice -- (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

(emphasis supplied).  Section 1349 sets forth the other: "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

The crux of Gelin and Lamarre's challenge is that the defrauded insurance companies do not fall within the statutory definition of the term "health care benefit program" because they (1) "did not serve as health insurance companies"; (2) did not "identif[y] themselves as health insurance companies"; and (3) covered medical expenses up to a maximum of $8,000 "if the victim [did] not have health insurance." Gelin and Lamarre, however, fail to direct us to any statutory language indicating that Congress intended to limit the scope of the statute to health insurance companies. Nor is there any requirement that an insurance company identify itself as a health insurance company to fall within the ambit of the statute. And the statute does not contain a threshold premium amount.

In any event, the statutory definition at issue is simple and broad: a "health care benefit program" is "<u>any</u> public or private plan or contract . . . under which <u>any</u> medical benefit, item, or service is provided . . . ." 18 U.S.C. § 24(b) (emphasis supplied). The common meaning of the adjective "any" as used in this context is "regardless of sort, quantity, or number." Webster's II New Riverside University Dictionary, 115 (1984); <u>see also</u> <u>SEC</u> v. <u>C.M. Joiner Leasing Corp.</u>, 320 U.S. 344, 350-51 (1943) (noting the long-standing rule of statutory construction that "courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context

and will interpret the text so far as the meaning of the word fairly permits so as to carry out in particular cases the generally expressed legislative policy").  In light of this language, we find no room for the limited scope Gelin and Lamarre urge us to read into the statute.[4]

The Second Circuit opinion in Lucien, 347 F.3d 45, provides an on-point example of how other courts have addressed contentions similar to those Gelin and Lamarre present.  There, defendants were convicted under § 1347 for defrauding private insurance companies providing coverage under New York's no-fault automobile insurance program.  The fraudulent scheme involved an elaborate ruse through which recruited "victims" of staged automobile accidents would assign their no-fault insurance benefits to participating health clinics.  Id. at 49.  The clinics, in turn, would generate fictitious treatment records and make reimbursement claims to the insurance companies for the medical services "provided."  Id.

---

[4]  Moreover, the statute's legislative history contains language showing that in enacting § 1347, Congress considered fraudulent schemes perpetrated on insurance companies of the type involved here.  See, e.g., H.R. Rep. No. 104-747, at 9 (mentioning, as an example of health care fraud in need of addressing, a scheme involving "staged automobile accidents and related casualty and health insurance fraud"); see also Gaming the Health Care System: Trends in Health Care Fraud, at 12 (stating that fraudulent medical treatment claims arising from phony car accidents "have resulted in literally tens of billions of dollars in losses to insurers and increased premiums to all policyholders," negatively impacting the health care system).

On appeal, one of the defendants challenged his conviction, arguing that New York's no-fault automobile insurance program was not a "health care benefit program" under § 24(b) because it did "not operate nationwide and it did not cover all injuries and illnesses--only those resulting from automobile accidents." Id. at 52. The Second Circuit disagreed, discarding the distinctions advanced as irrelevant and noting, as we do above, that the statutory definition unambiguously and broadly provides that any private contract under which a medical service is provided qualifies as a "health care benefit program." Id. The court also noted as a dispositive fact that private insurers, participating in New York's no-fault program, had "reimbursed various medical providers for fraudulently billed medical expenses incurred on behalf of defendants." Id. Other than the scope limitations described above, Gelin and Lamarre advance no reason why a different result is in order here, where the facts underlying their convictions mirror so closely those at play in Lucien.

Gelin and Lamarre argue in the alternative that the verb "provided" as used in § 24(b) means that medical benefits or services must actually be rendered for the statutory definition to apply. In other words, Gelin and Lamarre contend that the defrauded insurance companies cannnot be deemed "health care benefit program[s]" because they did not pay Premium for any actual

-13-

medical benefits or services rendered, only for fictitious services that were never "provided."  We disagree.

Gelin and Lamarre construe the verb "provide" too narrowly, fixing its meaning on only one of its possible connotations -- that is, "to furnish." See Webster's New Riverside University Dictionary, 948.  But the verb "provide" is quite versatile, and, among at least four different definitions, can mean "make available." Id.  In the context in which the verb "provide" is used here -- that is, § 1347 which proscribes "fraudulent pretenses, representations, or promises" in pursuing payment for health care services -- we must favor the broader construction, including the meaning "make available."  See C.M. Joiner Leasing Corp., 320 U.S. at 350-51.

Indeed, it would be nothing short of absurd to adopt Gelin and Lamarre's limitation on the construction of the statutory definition.  One of the most egregious and frequent expressions of prohibited conduct is obtaining payment for health care services never rendered.  Accordingly, if the statute were construed to exclude such conduct, it would defeat one of its most important purposes.  Convictions under § 1347 for fraud involving fictitious medical services abound.  See, e.g., United States v. McGovern, 329 F.3d 247, 249 (1st Cir. 2003) (conviction for Medicare and Medicaid fraud involving the billing of medical services never rendered); Lucien, 347 F.3d at 49 (same); United States v. Jones, 641 F.3d

-14-

706, 709 (6th Cir. 2011) (same); United States v. Franklin-El, 554 F.3d 903, 909 (10th Cir. 2009)(same).  And we have been provided with no valid reason to strike such a dissonant chord in this appeal.[5]

### B.  The As-applied Constitutional Challenge

Next we turn to Gelin and Lamarre's as-applied constitutional challenge.  On this front, they argue that their convictions under § 1347 resulted from an unconstitutional application of the Commerce Clause because the underlying fraud

---

[5]  Our conclusion is not contradicted by the legislative history. During the congressional hearings leading up to the enactment of § 1347, the Senate's Special Committee on Aging heard testimony from several witnesses -- ranging from high-ranking government officials to physicians and other private health care professionals -- describing serious concerns with what appeared to be a growing trend in the health care industry:

> Throughout the United States we are seeing organized criminal groups, compromising doctors, chiropractors, attorneys, hospitals, and these groups establish store front clinics, diagnostic testing companies, as well as bogus law offices. They stage phony car accidents. Fake patients visit the clinics where expensive medical procedures like MRIs and x-rays are billed to insurers, even though not provided to the persons posing as patients. In addition, unfilled prescriptions are billed, kickbacks are paid, and lawyers collect false personal injury claims.

Gaming the Health Care System: Trends in Health Care Fraud, Hearing Before the Senate Special Committee on Aging, 104th Cong. 12 (1995) (emphasis supplied).  The Committee on Governmental Reform and Oversight documented similar fraudulent practices arising from fictitious medical services and estimated the overall annual loses to the health care system in the $100 billion range.  See Comm. on Gov't Reform and Oversight, Health Care Fraud: All Public and Private Payers Need Federal Criminal Anti-Fraud Protections, H.R. Rep. No. 104-747 (1996).

-15-

arose from intrastate transactions and was perpetrated against intrastate parties. This is a constitutional twist to the sufficiency of the evidence argument raised below.[6] The applicable standard of review is plain error. See United States v. Capozzi, 347 F.3d 327, 334 (1st Cir. 2003). This standard calls for a four-pronged analysis where the first inquiry is limited to whether an error occurred. Id. If an error is found, then the inquiry shifts to whether such error (1) was clear and obvious; (2) affected substantial rights; and (3) "seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). This multi-factor analysis makes the road to success under the plain error standard rather steep; hence, reversal constitutes a remedy that is granted sparingly. United States v. Whitney, 524 F.3d 134, 140 (1st Cir. 2008).

Gelin and Lamarre fail to clear the first hurdle of the foregoing requirements, as the facts of record show that the underlying fraud sufficiently affected interstate commerce. As just stated, Gelin and Lamarre argue that their fraudulent scheme affected Massachusetts parties only. The record, however, contains

[6] As stated above, Gelin and Lamarre moved for acquittal, arguing that "[t]he trial presentation was completely and utterly void of any evidence that the health care fraud, as charged, had an [e]ffect on interstate commerce. Accordingly, the [g]overnment failed to offer sufficient evidence to prove each and every element of the offenses with which the defendant[s] w[ere] convicted."

-16-

ample evidence that some of the defrauded insurance companies were located outside Massachusetts and did business throughout the United States. Similarly, while Gelin and Lamarre argue that the transactions surrounding their fraudulent scheme occurred within Massachusetts' borders, the record shows that many of the checks Premium received as reimbursements for fraudulent claims were drawn on banks outside of Massachusetts. See, e.g., Pereira v. United States, 347 U.S. 1, 9 (1954) (finding that negotiation of check drawn on an out-of-state bank evinced an interstate transaction); Ramsey v. United States, 332 F.2d 875, 879 (8th Cir. 1964) (holding that a forged check drawn on an out-of-state bank was tantamount to placing the check in interstate commerce). The record also shows that Gelin and Lamarre used the United States Postal Service to mail their fraudulent claims for reimbursements. Cf. R.A.G.S. Couture, Inc. v. Hyatt, 774 F.2d 1350, 1353 (5th Cir. 1985) (finding a sufficient nexus with interstate commerce where the United States Postal Service had been used in fraudulent scheme underlying violations of the Racketeer Influenced and Corrupt Organizations Act). Last but not least, the record shows that the insurance policies under which fraudulent claims were paid extended nationwide health care benefits and covered both in- and out-of-state accidents. See United States v. Lucien, 78 F. App'x. 141, 144 (2d Cir. 2003) (holding that insurance policies covering both in- and out-of-state accidents removed a disincentive for

-17-

insureds to drive out of state and therefore affected interstate commerce).

Together, the foregoing facts, which Gelin and Lamarre omit from their analysis, comfortably exceed the showing of the de minimis interstate effect required to reject their contentions on this front. See, e.g., United States v. Guerrier, 669 F.3d 1, 7 (1st Cir. 2011) ("Proving an effect on interstate commerce is not too difficult . . . . [T]he government need not show a substantial interference--a de minimis one will due. Certainty of a de minimis effect is not required either. A 'realistic probability' suffices. And 'even potential future effects' may be enough.") (quoting United States v. Capozzi, 486 F.3d 711, 726 (1st Cir. 2007).

**C.  The Voir Dire Challenge**

Gelin and Lamarre's last line of attack fares no better. According to them, the district court committed reversible error when it declined to ask a proposed question to the venire that "would have displayed jurors' predispositions towards race . . . ." An appellate challenge asserting an improper exclusion of voir dire questions is reviewed for abuse of discretion. United States v. Gordon, 634 F.2d 639, 641 (1st Cir. 1980). The dispositive question under this standard of review is not whether "we, if sitting as a court of first instance, would have weighed the relevant considerations differently," Negrón-Almeda v. Santiago, 528 F.3d 15, 21 (1st Cir. 2008), but rather whether our review of

the record leaves us "with a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors."  Schubert v. Nissan Motor Corp., 148 F.3d 25, 30 (1st Cir. 1998).  "As the Supreme Court has noted, 'deference . . . is the hallmark of abuse-of-discretion review.'"  Guay v. Burack, 677 F.3d 10, 16 (1st Cir. 2012) (alteration in original) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 134, 143 (1997)).  This is certainly so when reviewing a trial judge's decisions during the venire, where she enjoys broad latitude and "need not pursue any specific line of questioning . . . provided it is probative on the issue of impartiality."  United States v. Brown, 938 F.2d 1482, 1485 (1st Cir. 1991); see also Fed. R. Crim. P. 24.

We have more than once stated that a "voir dire ordinarily need not include questions regarding racial prejudice," United States v. Escobar-de Jesús, 187 F.3d 148, 165-66 (1st Cir. 1999); see also United States v. Brown, 938 F.2d 1482, 1485 (1st Cir. 1991); United States v. Webb, 70 F. App'x. 2, 2-3 (1st Cir. 2003), and that "the mere fact that a defendant is black does not alone trigger [a] special questioning requirement . . . ."  Brown, 938 F.3d at 1485; see also Escobar-de Jesús, 187 F.3d at 165-66.[7]

---

[7]  Although there are certain cases in which special voir dire questions regarding race are constitutionally required, this is not one of them.  See Escobar-de Jesús, 187 F.3d at 165-66, for some examples of the types of cases where special questions are required.

In fact, in the past, we have unequivocally and consistently abided by the Supreme Court's plurality holding in United States v. Rosales-López, 451 U.S. 182, 191 (1981), that a trial judge's decision not to explore the possibility of racial or ethnic prejudice during the voir dire constitutes "reversible error only where the circumstances of the case indicate that there is a reasonable possibility that . . . prejudice might have influenced the jury."  See, e.g., Escobar-de Jesús, 187 F.3d at 165-66.

Gelin and Lamarre's submissions fail to address the preceding case law altogether.  Rather, they posit that race became a highly relevant issue through the trial because extensive portions of the testimony pointed to their Haitian heritage "in [a] very inflammatory manner."  They further claim that "the core of the government's case . . . was found in Little's testimony," which cemented "the general idea that [Gelin] was bigoted against other ethnicities and nationalities, particularly African-Americans." Because Little's credibility was "completely destroyed throughout the trial," Gelin and Lamarre continue, "it is likely that the government's introduction of negative racial stereotypes was given more weight than the actual evidence at trial."

An exhaustive review of the record proves Gelin and Lamarre's fears to be misplaced.  Among other things, the record shows that Little was one of at least 16 witnesses the government presented at trial.  The other 15 witnesses -- among them,

-20-

employees from the defrauded insurance companies, at least four automobile accident victims "treated" at Premium, several of Premium's employees, and an FBI agent -- provided testimony of their own which explicated Gelin and Lamarre's fraudulent scheme. The government also introduced extensive documentary evidence supporting the charges brought, including copies of (1) fraudulent claims filed; (2) fraudulent treatment charts; (3) the insurance policies under which the defrauded companies paid fraudulent claims; and (4) Premium's financial records. In other words, aside from Little's testimony suggesting that Gelin was racist towards African-Americans and limited evidence that Little herself was derogatory towards Gelin on account of his national origin, the other 15 witnesses who testified at length, as well as the documentary evidence introduced at trial, concentrated exclusively on the details of the underlying fraudulent scheme. This could suffice to rule out the possibility that prejudice may have influenced the jury in this case. Rosales-López, 451 U.S. at 191. But there is more.

First, the jury acquitted Gelin and Lamarre of some of the charges brought against them, which suggests that the evidence adduced at trial was impartially considered. Second, other than the racial overtones in Little's testimony, Gelin and Lamarre advance nothing whatsoever to show a likelihood of racial or ethnic prejudice that would have advised voir dire questions on the issue

of race.  <u>See</u>, <u>e.g.</u>,  <u>Rosales-López</u>, 451 U.S. at 192 ("[F]ederal trial courts must make such an inquiry when requested by a defendant accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups."); <u>Brown</u>, 938 F.2d at 1485 (finding that, where defendant was a black male, and all of the government's witnesses and jurors were white, voir dire inquiry about racial bias may be advisable, but not required, absent special circumstances surrounding the case which indicate the possibility of racial prejudice by the jury).

Third, as stated above, during the voir dire, the court underscored the need for a jury "that is composed of people who are completely fair-minded and impartial as to the parties involved in the case and as to the issues presented."  Though not with the level of specificity Gelin and Lamarre sought, the court asked prospective jurors questions to test their ability to render an impartial verdict in light of the charges at play in the case. Among other things, the court asked jurors whether they were employed by law enforcement or insurance companies, and whether they had been the victims of fraud or other crimes.  The court also asked potential jurors general questions about "any personal belief, attitudes, experiences, potential biases that would interfere with your ability to be a fair-minded and impartial juror in this case."  Under the circumstances at play here, this line of

questioning in itself thwarts the type of challenge launched by Gelin and Lamarre.  See <u>Brown</u>, 938 F.2d at 1485-86.

### III.  <u>Conclusion</u>

For the foregoing reasons, Gelin and Lamarre's convictions are affirmed.