# United States Court of Appeals
## For the First Circuit

No. 24-1275

UNITED STATES,

Appellee,

v.

RAYEVON DESCHAMBAULT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Aframe, Lynch, and Dunlap,
Circuit Judges.

Erin Opperman, with whom Law Offices of Erin R. Opperman was
on brief, for appellant.

Brian S. Kleinbord, Assistant U.S. Attorney, with whom
Andrew B. Benson, U.S. Attorney, was on brief, for appellee.

May 18, 2026

**DUNLAP**, **Circuit Judge**.  Defendant-Appellant Rayevon Deschambault ("Deschambault") seeks to overturn his convictions for sexual exploitation of a minor with the purpose of producing a visual depiction under 18 U.S.C. § 2251(a).  After Deschambault was arrested for drug trafficking during a sting operation, police obtained a warrant to search an iPhone for evidence related to that crime.  While executing the search, officers found two videos of Deschambault having sex with a minor, which led the government to charge him with two counts under § 2251(a).  Before trial, Deschambault filed several unsuccessful motions to suppress the videos, and during trial he raised several unsuccessful procedural and substantive objections to the voir dire questions and jury instructions.  The jury convicted Deschambault of both counts, and the district court sentenced him to 216 months' imprisonment followed by ten years of supervised release.  Deschambault now argues that the district court made five errors, any one of which independently requires us to vacate his convictions.  Because we find that the district court did not commit reversible error, we affirm.

## I.

First in June 2019 and again in mid-August 2019, a confidential informant working with Maine law enforcement conducted a controlled purchase of cocaine base from Deschambault.  Following the August 2019 transaction, the Maine Drug Enforcement

-2-

Agency ("Maine DEA") obtained an arrest warrant from a Maine state magistrate. The Maine DEA then directed the confidential informant to organize a third controlled purchase of cocaine base from Deschambault. On the day of the purchase, August 20, 2019, Maine DEA officers observed Deschambault as he left his residence and entered the front passenger-side door of the car which his girlfriend, Zilphy Avery ("Avery"), was driving. The officers then conducted a motor vehicle stop, arrested Deschambault, and searched the car. In the car, they found two cell phones -- a Samsung Galaxy on the driver's seat where Avery was sitting, and an iPhone beneath the passenger's seat where Deschambault was sitting. Also beneath that passenger's seat, officers found a black gym bag with a loaded handgun, a digital scale with cocaine residue, and other drug paraphernalia. The special agent at the scene called the number that the confidential informant had used to set up the controlled purchase, and the iPhone rang and displayed the special agent's number on the caller ID.

On September 4, 2019, upon application by the Maine DEA, a Maine state judge signed a search warrant for the iPhone. The application was supported by an affidavit from an investigating state law enforcement official. The state warrant authorized law enforcement to search and seize "[r]ecords, documents or data" contained within the iPhone which "[p]ertain to Rayevon Deschambault's use of the portable electronic device to engage in

-3-

the crime of Aggravated Drug Trafficking in Schedule W Drugs," or which "[d]emonstrate ownership, possession or use of the [iPhone]." The state warrant also permitted any digital evidence seized from the iPhone to be copied, analyzed, or examined by agents after law enforcement executed the state warrant. A separate search warrant -- which is not at issue in this appeal -- also enabled officers of the Maine DEA to enter and search Deschambault's bedroom, where they recovered cash and cocaine base.

While searching the contents of the iPhone, law enforcement came across three videos relevant to this case. The first video depicts penile-vaginal intercourse between Deschambault and a female minor, the second depicts oral intercourse performed by the same minor on Deschambault,[1] and the third -- which does not feature sexual activity -- depicts the minor next to Avery in Deschambault's bedroom. In the third video, Deschambault pans the iPhone camera around the room and refers to the room as a "dirty ass trap house room" -- an apparent reference to the room's use for illegal drug distribution. The videos were filmed over the course of roughly eight hours and date stamped

---

[1] In both the first and second videos, Deschambault's face is not shown. Rather, he is identified by the unique tattoos on his arms and hands which match those in the video.

between the late hours of August 13, 2019, and the early morning hours of August 14, 2019.

The agent who first reviewed the videos on September 18, 2019, did not recognize the female minor, but thought she appeared "youthful" based on her physical features. The agent shared the videos with another officer, who then distributed a clothed picture of the minor to other law enforcement for the purpose of identifying the female. One officer recognized the female as O.S.[2] from her prior involvement in drug activity and knew that she was a minor. The same day, the Maine DEA contacted the Federal Bureau of Investigation ("FBI") to confer over the sexually explicit videos identified on the phone, believing them to be child pornography. With help from O.S.'s school district, officers identified O.S. as a fourteen-year-old girl and contacted her mother. Officers went to O.S.'s residence later that day, where O.S. disclosed to the officers that she knew Avery, had spent time with her over the summer, and knew Avery's boyfriend, albeit by an alias -- "Minolo" -- that law enforcement knew Deschambault commonly used. O.S. also stated that she was aware that Avery and her boyfriend sold cocaine, and that they had once attempted to recruit her to do so.

---

[2]  As the district court did, we use the minor's initials rather than her full name.

On September 24, 2019, an FBI Task Force officer applied to a federal magistrate judge for a search warrant to search Deschambault's phone, this time for sexual material. The magistrate judge issued the search warrant, and in September 2021, Deschambault was charged in a superseding indictment with, as relevant here, two counts of sexual exploitation of a child under 18 U.S.C. § 2251(a).

Before trial, Deschambault unsuccessfully sought to suppress the sexual videos, and requested that the court ask specific questions of the jury during voir dire. During and after trial, Deschambault requested several jury instructions on § 2251(a), but the court denied his requests. Deschambault was ultimately convicted on both counts. He then unsuccessfully challenged the jury's guilty verdicts, alleging there was insufficient evidence to convict. He now pursues several related arguments on appeal.

## II.

### A. Motions to Suppress

The first issue we confront stems from Deschambault's motions to suppress the videos underlying his conviction. On appeal, he challenges only the state warrant authorizing the initial search of the phone as not based on probable cause or meeting the particularity requirement. He also argues that the officers executing that warrant exceeded its scope when, after

-6-

discovering the videos, they began investigating whether the videos depicted child sexual exploitation. He does not challenge the later federal warrant, which was obtained after discovery of the videos to authorize a broader forensic search of the phone for evidence of child sexual exploitation.

We review the legal conclusions underlying a denial of a motion to suppress de novo, and the factual conclusions for clear error. United States v. Cortez, 108 F.4th 1, 7 (1st Cir. 2024). Because we view the facts in "the light most favorable to the district court's ruling," the ruling will be upheld "[s]o long as any reasonable view of the evidence supports it." Id. (quoting United States v. Cowette, 88 F.4th 95, 100 (1st Cir. 2023)); see also United States v. Perez Soto, 80 F.4th 50, 59 (1st Cir. 2023). And where, as here, the search was conducted pursuant to a warrant, the defendant "faces an even higher burden" because we give "considerable deference to reasonable inferences the [issuing judge] may have drawn from the attested facts" and, "[i]n a doubtful or marginal case," "defer[] to the issuing [judge's] determination of probable cause." Cortez, 108 F.4th at 7 (quoting United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002)); see also United States v. Coleman, 149 F.4th 1, 23 (1st Cir. 2025). Even without this deference, the outcome would be the same here because the state warrant affidavit establishes probable cause under any standard of review.

### 1. Constitutionality of the State Warrant

This case requires us to consider how the strictures of the Fourth Amendment apply to technology -- here, a cell phone -- that was not envisioned at the founding. See generally Carpenter v. United States, 585 U.S. 296, 303-05 (2018); Riley v. California, 573 U.S. 373, 385-86, 403 (2014); Kyllo v. United States, 533 U.S. 27, 31-34 (2001). To do so, we look to the constitutional text and relevant case law. The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Under its plain language, the Fourth Amendment imposes two requirements of import in this case. First, a warrant must be supported by probable cause, and second, it must be particularized such that it is not overbroad. See Kentucky v. King, 563 U.S. 452, 459 (2011); United States v. Lindsey, 3 F.4th 32, 39-40 (1st Cir. 2021).

#### a. Probable Cause

A judge's decision to issue a search warrant based on probable cause "cannot be a mere ratification of the bare conclusions of others," but must be supported by an affidavit which provides a judge with "[s]ufficient information" to be able to

independently find the necessary elements of probable cause satisfied. Illinois v. Gates, 462 U.S. 213, 239 (1983). Specifically, warrant applications "must demonstrate probable cause to believe that (1) a crime has been committed -- the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched -- the so-called 'nexus' element." United States v. Mendoza-Maisonet, 962 F.3d 1, 17 (1st Cir. 2020) (quoting United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005)). The nexus requirement is satisfied if there is a "fair probability -- not certainty -- that evidence of a crime will be found in a particular location based on the totality of the circumstances." Lindsey, 3 F.4th at 39 (internal quotation marks omitted) (quoting United States v. Dixon, 787 F.3d 55, 60 (1st Cir. 2015)). "The nexus . . . may be 'inferred from the type of crime, the nature of the items sought, . . . and normal inferences as to where a criminal would hide [evidence of a crime].'" Id. (second omission in original) (quoting United States v. Rodrigue, 560 F.3d 29, 33 (1st Cir. 2009)).

The federal district court judge correctly concluded that the state judge issuing the warrant had probable cause. The application for that warrant established an adequate nexus between Deschambault's suspected drug trafficking and the iPhone. Our conclusion turns on the fact that Deschambault's drug trafficking was intimately related to his use of the iPhone: The state warrant

application established that a confidential informant "spoke to Deschambault" to arrange a purchase of cocaine base to take place roughly ten to fifteen minutes later and identified to police the phone number he used to communicate with Deschambault. Further, the state warrant application notes that two phones were found in the car at the time of Deschambault's and Avery's arrests; of these phones, the relevant iPhone was located under the seat where Deschambault was sitting and rang when the special agent at the scene called the number provided by the confidential informant, displaying the special agent's caller ID. The state warrant application also described how the iPhone was stowed together with other items under the passenger seat where Deschambault was sitting: A silver handgun within a black gym bag, a digital scale with cocaine residue, and cellophane bags with the corners cut, consistent with illegal drug packaging. Collectively, these facts supported the state issuing judge's finding of probable cause to believe that the iPhone was an instrumentality of Deschambault's drug trafficking and contained records, documents, and data related to his trafficking.

Indeed, Deschambault wisely did not seem to press this issue far in the trial court, and does not do so now. The district court noted that Deschambault largely conceded that there was an adequate nexus between the suspected drug trafficking and the iPhone. The gravamen of Deschambault's argument is instead that

the state warrant was not sufficiently particular -- the issue to which we now turn.

### b. Particularity

The Fourth Amendment demands particularity in search warrants. The general rule is that the scope of a search "is defined by the object of the search and the places in which there is probable cause to believe that it may be found." United States v. Ross, 456 U.S. 798, 824 (1982). Courts, however, "have struggled to adapt Fourth Amendment search doctrines designed for physical spaces to digital contexts." United States v. Perez, 712 F. App'x 136, 139 (3d Cir. 2017) (unpublished); see Riley, 573 U.S. at 400; United States v. Loera, 923 F.3d 907, 916 (10th Cir. 2019). Deschambault argues that, even if there was probable cause to find a nexus between the suspected drug trafficking and the iPhone, the state warrant should have been limited to some subset of the phone's contents -- such as text messages or call logs -- and should not have permitted a search of the entire phone, including its photographic or videographic contents. Under the facts presented here, we disagree.

The state warrant allowed a search of the iPhone for evidence that would "[p]ertain to [Deschambault]'s use of the [iPhone] to engage in the crime of Aggravated Trafficking in Schedule W Drugs" or that would "[d]emonstrate ownership, possession or use of the [iPhone], or the data contained therein."

-11-

It also allowed officers to search "[r]ecords, documents or data . . . including but not limited to graphic visual images (such as photographs, videos and scanned images), electronic communications (such as cell phone calls, text messages, email and email attachments, chat room communications, or writings created on word processing software or notepads), stored data files and folders, records of online activity (such as Internet browser history, search engine history, and file transfers), calendar or diary entries, activity logs, and location data."

We acknowledge the concern that cell phones today include vast amounts of personal data, which -- taken together -- can paint a detailed portrait of a person's life. See Carpenter, 585 U.S. at 305; Riley, 573 U.S. at 393-96; United States v. Wurie, 728 F.3d 1, 6-9 (1st Cir. 2013), aff'd sub nom., Riley, 573 U.S. 373; United States v. Morton, 46 F.4th 331, 341 (5th Cir. 2022) (en banc) (Higginson, J., concurring); Loera, 923 F.3d at 916. Broad searches of cell phones are necessarily intrusive, and can raise difficult questions. See United States v. Chatrie, 136 F.4th 100, 112 (4th Cir. 2025) ("As we contemplate the future, Fourth Amendment interpretation leads to twin risks. One is the risk that privacy will succumb to the evermore invasive technological capabilities at the hands of an evermore intrusive state. The other risk, which is just as real, is that of privileging those who break the law over those who would enforce

-12-

it." (Wilkinson, J., concurring)), <u>cert. granted in part</u>, 223 L. Ed. 2d 553 (Jan. 16, 2026). Nevertheless, in this case, the state warrant was sufficiently particular.

We have "previously construed particularity as implicating two distinct demands." <u>United States</u> v. <u>Corleto</u>, 56 F.4th 169, 176 (1st Cir. 2022); <u>see also</u> <u>United States</u> v. <u>Upham</u>, 168 F.3d 532, 535 (1st Cir. 1999). A valid warrant "(1) must supply enough information to guide and control the executing agent's judgment in selecting where to search and what to seize, and (2) cannot be too broad in the sense that it includes items that should not be seized." <u>Corleto</u>, 56 F.4th at 176 (quoting <u>Lindsey</u>, 3 F.4th at 40); <u>see also</u> <u>United States</u> v. <u>Kuc</u>, 737 F.3d 129, 133 (1st Cir. 2013) (holding that a warrant must be "read in context," not by isolating one broad phrase from the rest of the document). Read against that standard, the state warrant here was sufficiently particular. True, it authorized review of a wide range of phone data. But it limited the search to records, documents, and data that pertained to Deschambault's use of the iPhone "to engage in the crime of Aggravated Trafficking in Schedule W Drugs" or that would "[d]emonstrate ownership, possession or use of the [iPhone], or the data contained therein." <u>Cf.</u> <u>Corleto</u>, 56 F.4th at 176 ("[A] warrant affidavit need [not] predict with omniscient precision exactly where on the premises the evidence to be seized may be located.").

-13-

Further, there was no reason to believe that a more limited search would have been sufficient; although the text messages and call log contained on the iPhone were certainly areas in which law enforcement would have probable cause to locate evidence, there was also good reason to suspect that evidence of drug trafficking could be found in other areas of the iPhone, such as stored pictures and videos. Our cases are replete with examples showing that cell phone evidence of drug trafficking often extends beyond calls and text messages to photographs, videos, and other stored digital material. See, e.g., United States v. Mello, 164 F.4th 120, 127-28 (1st Cir. 2026) (detailing phone search revealing photographs of FedEx tracking information for pill shipments and a photograph of a large bag of pills); United States v. Amado, 157 F.4th 87, 96 (1st Cir. 2025) (describing forensic analysis of cell phones revealing photos of the defendant and his associates posing with large amounts of cash and videos of the defendant in a drug-mixing room and holding firearms later seized from the stash apartment); United States v. Galíndez, 999 F.3d 60, 64 (1st Cir. 2021) (observing that the defendant's cell phone "had photos of drugs"); cf. United States v. Munera-Gomez, 70 F.4th 22, 28 (1st Cir. 2023) (noting defendant's instruction to "take a photo of the cash as proof" during a cocaine transaction). The Fourth Amendment did not require the issuing state court judge, in these

-14-

circumstances, to confine the search to only selected phone functions or applications.

Deschambault relies on Burns v. United States, where the D.C. Court of Appeals found a search warrant that reached "[a]ll records on the [phone] that relate to violations of . . . [the first-degree murder statute]" to be overbroad. 235 A.3d 758, 769 (D.C. 2020) (third alteration in original); see also id. at 774. In Burns, the court concluded that -- because of the heightened privacy concerns related to cell phones -- a warrant to search a cell phone

> must specify the particular items of evidence to be searched for and seized from the phone and be strictly limited to the time period and information or other data for which probable cause has been properly established through the facts and circumstances set forth under oath in the warrant's supporting affidavit.

Id. at 773. Burns articulated that proposition without citation to any authority beyond the Supreme Court's decision in Riley, 573 U.S. 373. But Riley addressed warrantless searches of cell phones incident to arrest and did not purport to define the permissible scope of a cell phone search pursuant to a warrant. See Burns, 235 A.3d at 773.

We need not decide whether Burns correctly applied the Fourth Amendment because that decision is nonbinding on this court and is readily distinguishable on its facts. See United States v. Smith, No. CR 19-324 (BAH), 2021 WL 2982144, at *10 (D.D.C.

-15-

July 15, 2021), aff'd, 108 F.4th 872 (D.C. Cir. 2024) (declining to follow Burns's approach to cell phone warrants, describing it as "contrary to substantial federal caselaw" and distinguishing Burns on its facts). Burns is distinguishable because it did not involve drug trafficking but instead a single instance of murder. Cf. Lindsey, 3 F.4th at 39-40 (holding that evidence of active drug dealing, together with the affiant's statement that drug dealers commonly use multiple cell phones to conceal their business, supported a fair inference that the phones would contain evidence of drug dealing); Mello, 164 F.4th at 127-28; Amado, 157 F.4th at 96. And Burns itself confined its holdings to its facts and expressly distinguished cases in which "affidavits submitted in support of the warrants made robust showings of probable cause for a range of relevant evidence likely to be contained within the phones' data, without a way of knowing in advance precisely where within that data the evidence would be found." 235 A.3d at 776. The supporting affidavit for the state warrant in this case tied the iPhone believed to belong to Deschambault directly to the alleged trafficking activity. The affidavit stated that a confidential informant had "made arrangements to purchase $120.00 worth of cocaine base from Deschambault" "while communicating with [him] through the phone found in the" car in which he was riding on the date of his arrest, and concluded that the iPhone "was an instrumentality of his crime" and contained "records, documents

-16-

and data that are evidence of his crime."  The affidavit also explained that, based on the affiant's training and experience, cell phones may contain evidence of drug trafficking in multiple forms, including "graphic visual images," "electronic communications," "records of online activity," "activity logs," and "location data."  So, even taking Burns at face value, the affidavit here supplied the kind of case specific showing that justified the phone search authorized by the state warrant.

Deschambault separately argues that the state warrant was overbroad because the supporting affidavit identified the iPhone at issue as "belonging to . . . Deschambault," and so, he contends, there was no need to search the phone for evidence of ownership, possession, or use.  This argument plainly fails.  The affidavit's ownership language reflected the evidence then available to law enforcement: officers had discovered the phone under the passenger seat where Deschambault had been sitting, and the phone rang when officers called the number the confidential informant had used to arrange controlled buys with him.  Those facts may have supported a fair inference that the phone belonged to Deschambault, but they did not conclusively establish ownership, possession, or use of the phone or its data, and did not foreclose officers from searching for evidence of the same pursuant to a valid warrant.

## 2. Execution of the State Warrant

Having concluded that the issuance of the search warrant itself was not unconstitutional, we must next consider whether the district court erred in refusing to suppress the videos at issue on the grounds that the searching officers exceeded the scope of the search warrant. We review the district court's determination of whether the government exceeded the scope of the state warrant de novo. United States v. Wright, 937 F.3d 8, 14 (1st Cir. 2019) (citing United States v. Peake, 804 F.3d 81, 86 (1st Cir. 2015)). A search warrant must "describ[e] the place to be searched" and the "things to be seized." U.S. Const. amend. IV. "The authority conferred by the warrant 'is circumscribed by the particular places delineated in the warrant and does not extend to other or different places.'" Peake, 804 F.3d at 86 (quoting United States v. Fagan, 577 F.3d 10, 13 (1st Cir. 2009)). "Whether a search exceeds the scope of a search warrant is an issue we determine through an objective assessment of the circumstances surrounding the issuance of the warrant, the contents of the search warrant, and the circumstances of the search." United States v. Sheehan, 70 F.4th 36, 43 (1st Cir. 2023) (quoting United States v. Pimentel, 26 F.4th 86, 92 (1st Cir. 2022)). We have said that "there is some breathing room in our analysis, since 'search warrants and affidavits should be considered in a common sense manner.'" Pimentel, 26 F.4th at 93 (quoting Peake, 804 F.3d at 87).

-18-

Deschambault argues that the investigating officer stepped outside of the bounds of the search warrant -- which authorized a search of the iPhone for evidence of drug trafficking and evidence as to the iPhone's owner, possessor, and user -- when he began to investigate evidence of child pornography without seeking a new warrant. Specifically, after coming across the oral sex video, the investigating agent noted that the female appeared "youthful," and -- after determining that she was "youthful" -- began to "try to identify who she was" by circulating a clothed image of the minor to other police officers and providing the video to the FBI.

We disagree that the officer exceeded the scope of the state warrant: The videos reviewed by the officer were directly relevant to the ongoing drug trafficking investigation. The videos depict bedding, wall paneling, and a background identical to the bedroom in which law enforcement found cocaine and cash; they also depict recorded statements by Deschambault that pertain to the use of the room for drug activity. As a result, these videos help identify Deschambault as the user, possessor, and operator of the iPhone and -- by placing him, O.S., and Avery together within a room used to store drugs and drug money -- help establish his connection to the seized drugs. Each of these videos therefore falls squarely within the scope of the warrant. See Perez Soto, 80 F.4th at 60 (holding that "as long as the search was within the

scope of the warrant, it is no matter that the officers may have hoped to find drugs", and that "[w]hat matters is whether the officers looked in places or in ways not permitted by the warrant").[3]

Nonetheless, Deschambault complains that upon finding these videos, the agent began investigating the age and identity of the female in the video. But we do not see why that matters. Deschambault identifies neither binding nor persuasive authority indicating that evidence lawfully seized pursuant to a valid warrant for one crime cannot be used to investigate another, different crime -- particularly where, as here, the agent ultimately sought a federal warrant to further investigate that additional crime. See, e.g., Perez Soto, 80 F.4th at 60; cf.

---

[3] See also United States v. Hasbajrami, 945 F.3d 641, 662 (2d Cir. 2019) (holding that "law enforcement officers do not need to seek an additional warrant or probable cause determination to continue surveillance when, in the course of executing a warrant or engaging in other lawful search activities, they come upon evidence of other criminal activity outside the scope of the warrant or the rationale justifying the search" (emphasis omitted)); United States v. Loera, 923 F.3d 907, 911 (10th Cir. 2019) (holding that "the Fourth Amendment does not require police officers to stop executing an electronic search warrant when they discover evidence of an ongoing crime outside the scope of the warrant, so long as their search remains directed at uncovering evidence specified in that warrant"); United States v. Stabile, 633 F.3d 219, 240 (3d Cir. 2011) (noting that agent was lawfully searching a folder when he discovered evidence of additional crimes); United States v. Mann, 592 F.3d 779, 783-84 (7th Cir. 2010) (concluding that agent was searching for items within the scope of the original warrant and did not abandon that search when he discovered the evidence of additional crimes).

United States v. Vento, 533 F.2d 838, 857 (3d Cir. 1976) ("[I]t is not unusual for an investigation of one crime to uncover leads regarding another crime. To follow the newly discovered trail is the investigator's duty."). Moreover, in beginning to investigate the identity of the minor, law enforcement officers were not abandoning the drug investigation; rather, they were pursuing a lead relevant to the drug investigation. Ultimately, the inquiry into the identity of the minor led the officers to question O.S. and discover that she had knowledge of Deschambault's drug trafficking, had been asked by Deschambault and Avery to participate in the drug trafficking, and could link Deschambault to the bedroom containing drugs. It was within the scope of the drug investigation to identify O.S. and interview her.

Accordingly, this case is easily distinguishable from the Tenth Circuit's decision in United States v. Carey, 172 F.3d 1268 (10th Cir. 1999). In that case, the defendant was, like Deschambault, initially under investigation for the sale of drugs when a search of his computer turned up unrelated evidence of child pornography. See id. at 1270-72. There, the court reasoned that because the searching officer temporarily abandoned his search for drug evidence and proceeded to look for more evidence of child pornography on the computer, he exceeded the scope of the warrant, which had only authorized a search for evidence of drug activity. Id. at 1276. Here, unlike in Carey, the videos directly related

-21-

to the drug trafficking that was the subject of the state warrant because they were taken in the room where drugs were found. Moreover, unlike in Carey, the suspect was himself part of the child pornography that was uncovered, and the victim identified in the videos could provide testimony relating to the suspect's drug activities. Carey therefore does not support a conclusion that the law enforcement officers in this case unlawfully expanded the scope of their investigation. See United States v. Mann, 592 F.3d 779, 783-84 (7th Cir. 2010) (distinguishing Carey); United States v. Burgess, 576 F.3d 1078, 1092 (10th Cir. 2009) (noting that Carey is limited to its facts).

## B.    Voir Dire Questions on Racial Bias

We turn next to the propriety of the voir dire. "We review the district court's voir dire decisions for abuse of discretion." Coleman, 149 F.4th at 26; see also United States v. Tsarnaev, 595 U.S. 302, 313 (2022). The Supreme Court has held that jury selection "falls particularly within the province of the trial judge," whose "broad discretion" includes deciding "what questions to ask prospective jurors." Tsarnaev, 595 U.S. at 312-13 (first quoting Skilling v. United States, 561 U.S. 358, 386 (2010)). We will reverse "only if 'our review of the record leaves us with a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.'" Coleman, 149 F.4th at

26 (quoting United States v. Parker, 872 F.3d 1, 6 (1st Cir. 2017)).  We find no abuse of discretion here.

Voir dire "plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored."  Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981).  "In some circumstances, the Constitution requires the court to ask 'special voir dire question[s]' to address '[t]he possibility of racial prejudice.'"  Coleman, 149 F.4th at 26 (alterations in original) (quoting United States v. Brown, 938 F.2d 1482, 1485 (1st Cir. 1991)); see also Peña-Rodriguez v. Colorado, 580 U.S. 206, 223 (2017) ("In an effort to ensure that individuals who sit on juries are free of racial bias, the Court has held that the Constitution at times demands that defendants be permitted to ask questions about racial bias during voir dire.").[4]

---

[4]  In United States v. Brown, 938 F.2d 1482 (1st Cir. 1991), "we pointed to two [Supreme Court] cases as examples of those circumstances: one 'involv[ed] a black civil rights activist whose defense to a marijuana possession charge was that he had been framed by local white police' and one 'involv[ed] [the] sentencing of a black defendant who had been convicted of a capital offense' for killing a white storekeeper."  Id. at 1485; United States v. Coleman, 149 F.4th 1, 26 n.14 (1st Cir. 2025) (second, third, and fourth alterations in original) (quoting Brown, 938 F.2d at 1485) (citing Ham v. South Carolina, 409 U.S. 524 (1973); Turner v. Murray, 476 U.S. 28 (1986)).  Both were cases in which race was "inextricably bound up with the conduct of [defendant's] trial."  United States v. Parker, 872 F.3d 1, 7 (1st Cir. 2017) (alteration in original) (quoting Brown, 938 F.2d at 1485) (citing Ristaino v. Ross, 424 U.S. 589, 597 (1976)).  In Turner, the Court held that a "capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and

-23-

However, we have held more than once that "voir dire '[o]rdinarily . . . need not include questions regarding racial prejudice' and that '[t]he mere fact that a defendant is black does not alone' activate 'the special questioning requirement.'" Parker, 872 F.3d at 7 (alterations in original) (quoting Brown, 938 F.2d at 1485); see also United States v. Gelin, 712 F.3d 612, 621 (1st Cir. 2013).

Under the Supreme Court's "supervisory authority over the federal courts," a trial judge's decision not to explore the possibility of racial or ethnic prejudice constitutes "reversible error only where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury." Rosales-Lopez, 451 U.S. at 190-91; see also United States v. Cezaire, 939 F.3d 336, 338 (1st Cir. 2019). Even so, our decisions, following Supreme Court precedent, have recognized that the better course, even when not constitutionally required, "generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant." Parker, 872 F.3d at 7 (quoting Brown, 938 F.2d at 1485) (citing Ristaino v. Ross, 424 U.S. 589, 597 n.9 (1976)); see also Gelin, 712 F.3d at 621.

---

questioned on the issue of racial bias." 476 U.S. at 36-37 (emphasis added).

Even where "the subject of possible racial bias must be 'covered' by the questioning of the trial court in the course of its examination of potential jurors," the Supreme Court has been "careful not to specify the particulars by which this could be done." United States v. Casanova, 886 F.3d 55, 60 (1st Cir. 2018) (quoting Parker, 872 F.3d at 8); see also Mu'Min v. Virginia, 500 U.S. 415, 431 (1991). As the Court's cases, and our own, have repeatedly emphasized, the trial judge retains broad discretion over the form and scope of voir dire. See Ham v. South Carolina, 409 U.S. 524, 527 (1973); Turner v. Murray, 476 U.S. 28, 37 (1986); Rosales-Lopez, 451 U.S. at 189-90; Gelin, 712 F.3d at 621; Coleman, 149 F.4th at 27-28; cf. United States v. Giang, No. 24-1829, 2026 WL 1090647, at *6 (1st Cir. Apr. 22, 2026) ("[I]n the ordinary case, when a trial judge instructs jurors that they must not be swayed 'by prejudice . . . ,' the judge does not commit reversible error by declining to offer a more specific instruction not to consider race, ethnicity, or national origin," particularly "where the court also conducts a thorough voir dire intended to root out potential bias." (quoting United States v. Díaz-Arias, 717 F.3d 1, 23-24 (1st Cir. 2013) (citing Correia v. Fitzgerald, 354 F.3d 47, 53 (1st Cir. 2003)))). A trial judge "need not pursue any specific line of questioning [as to racial bias] . . . provided it is probative on the issue of impartiality." Gelin, 712 F.3d at 621 (omission in original) (quoting Brown, 938 F.2d at 1485).

-25-

Because he is black and O.S. is white, Deschambault requested the district court probe potential jurors for bias against interracial relationships. Specifically, he requested the court ask, during voir dire:

> Do you have any feelings or opinions concerning mixed marriages or relationships, such as between a Black male and a White woman, that might influence your ability to be fair and impartial in deciding whether the Government has proven its case beyond a reasonable doubt?

The court denied his request, but nonetheless agreed to ask three other questions Deschambault had requested to probe jurors for racial bias:

> (1) Do you have any strong feelings or opinions concerning Black individuals that would make it difficult to be fair and impartial in determining whether the Government has proven the charges beyond a reasonable doubt?
>
> (2) Do you believe that a Black person is more or less likely to commit a crime than a White person?
>
> (3) Have you had any negative experience(s) with a Black person that might influence your ability to be fair and impartial in determining whether the government has proven its case beyond a reasonable doubt?

In denying Deschambault's request to ask the interracial relationship question, the court noted that the "core concern is whether the jury or any jury member would be biased for or against someone who is non-White, and I think that's covered . . . in question number one." Deschambault disagrees and presses, on

-26-

appeal, that prejudice against interracial relationships is a unique form of bias not encompassed by questions regarding race generally. We are not persuaded that the district court abused its discretion in this case.

On the record before us, the district court was not required to ask the question proposed by Deschambault. The law does not require a trial judge to ask a defendant's preferred question about racial bias or to probe every asserted variant of racial bias in the precise terms the defendant proposes. See Rosales-Lopez, 451 U.S. at 189-90. As we have said, even where the potential for racial bias must be covered during voir dire, the district court "need not pursue any specific line of questioning . . . provided it is probative on the issue of impartiality." Gelin, 712 F.3d at 621 (omission in original) (quoting Brown, 938 F.2d at 1485); see also Casanova, 886 F.3d at 60.

The district court did ask three questions inquiring into racial prejudice, which fairly addressed the essential concerns underlying Deschambault's requested voir dire on interracial bias. See Parker, 872 F.3d at 7 (holding that three questions posed to jurors as a group "designed to weed out racial bias" sufficed because they "captured the essence of what [the

defendant] wanted asked," even if not "word for word").[5] While Deschambault may dispute the form, language, and specificity of those questions, we reiterate that it is "more than enough" for a court to "cover[] the substance of the appropriate areas of concern by framing its own questions in its own words." United States v. Sherman, 551 F.3d 45, 51 (1st Cir. 2008) (quoting Real v. Hogan, 828 F.2d 58, 62 (1st Cir. 1987)); see Parker, 872 F.3d at 7; Casanova, 886 F.3d at 60; Mu'Min, 500 U.S. at 431; see also Cezaire, 939 F.3d at 338-40 (on plain error review, holding that the district court's failure to ask a question about racial bias at voir dire was not clear or obvious error where the defendant's request was at least forfeited and the court instead questioned jurors about bias generally). For example, by asking whether jurors had any "strong feelings or opinions concerning Black individuals," the district court probed the potential for jurors to presume that black men are likely to be sexually aggressive or coercive and therefore sufficiently "identif[ied] potential biases and . . . whether prospective jurors could be fair and impartial

---

[5] See also Coleman, 149 F.4th at 27-28 (finding no abuse of discretion where the district court, after identifying the defendant and victim as African-American, asked a single voir dire question addressing impartiality, including the potential for racial prejudice, and later instructed the jury about prejudice "we may not even be conscious of"); cf. United States v. Casanova, 886 F.3d 55, 59-60 (1st Cir. 2018) (on plain error review, holding that questions posed to prospective jurors as a group, rather than individually, probing racial bias were sufficient "to safeguard [the defendant's] right to an impartial jury).

in deciding the case." United States v. Delgado-Marrero, 744 F.3d 167, 201 (1st Cir. 2014). "Fairly viewed, the judge's questions . . . captured the essence of what [Deschambault] wanted asked," and "even if they did not match up word for word -- certainly they showed the judge's sensitivity to racial-prejudice concerns." Parker, 872 F.3d at 7; see also Coleman, 149 F.4th at 26-28. Under the abuse of discretion standard, that much is enough.

Finally, we note that -- as the district court observed -- the proposed question relating to interracial "relationships" was ill-suited to the circumstances of this case. The "relationship" at issue here was between an adult and a minor who cannot consent. See United States v. Montijo-Maysonet, 974 F.3d 34, 53 (1st Cir. 2020). The court thus did not abuse its discretion by declining to ask the question sought by Deschambault.

## C. Exclusion of Evidence Regarding Mistake of Age

We turn now to a third issue raised by Deschambault. At trial, Deschambault sought to introduce evidence suggesting he believed O.S. to be above the age of eighteen at the time of their sexual encounters, arguing that -- in order to find him guilty -- the jury had to find beyond a reasonable doubt that he knew he was violating the law by producing child pornography. Specifically, he sought to introduce a screenshot of O.S.'s Facebook profile which indicated she was born in 1995, and an

-29-

assertation that O.S. told Deschambault's mother that she was nineteen. The district court excluded this evidence because mistake of age is not a permissible defense under § 2251. "[W]e review the district court's rulings on whether to admit or exclude evidence . . . for abuse of discretion." Coleman, 149 F.4th at 28 (quoting United States v. Brown, 510 F.3d 57, 66 (1st Cir. 2007)). The district court did not abuse its discretion because it correctly interpreted § 2251.

We have already rejected a mistake-of-age defense under § 2251(a). United States v. Henry, 827 F.3d 16, 23-25 (1st Cir. 2016). As we said in Henry, the text of § 2251 "plainly does not require that a person convicted of violating the statute needs to know the actual age of the minor victim." Id. at 23. Rejecting a First Amendment challenge to this reading of the statute, we went on to observe that a "defendant's knowledge or lack of knowledge concerning the victim's actual age is irrelevant in a prosecution for violating section 2251(a)." Id. In reaching this conclusion, we cited United States v. X-Citement Video, Inc., where the Supreme Court observed that "producers may be convicted under § 2251(a) without proof they had knowledge of age." 513 U.S. 64, 76 n.5 (1994).[6] It necessarily flows from Henry that Deschambault's evidence was properly excluded.

---

[6] Every circuit that has considered this issue since United States v. X-Citement Videos, Inc, 513 U.S. 64 (1994) has similarly

Deschambault tries to circumvent this conclusion by arguing that § 2251(a) is a specific intent crime which requires that he have the specific intent to violate the law by producing child pornography. He points us to the Sixth Circuit's description of § 2251(a) as a specific intent crime, claiming that such crimes require that "the defendant must purposefully or intentionally commit the act that violates the law and do so intending to violate the law." United States v. Frei, 995 F.3d 561, 566 (6th Cir. 2021) (emphasis added); see United States v. Ramamoorthy, 949 F.3d 955, 961 (6th Cir. 2020).

We agree that § 2251(a) contains a specific intent element; however, the specific intent required under the statute is the specific intent to commit the act of producing a visual depiction of sexually explicit conduct. See United States v.

concluded that mistake of age is no defense to § 2251(a) liability. See, e.g., United States v. Fletcher, 634 F.3d 395, 400 (7th Cir. 2011); United States v. Pliego, 578 F.3d 938, 943-44 (8th Cir. 2009); United States v. Malloy, 568 F.3d 166, 172–73 (4th Cir. 2009); United States v. Griffith, 284 F.3d 338, 349-51 (2d Cir. 2002); see also United States v. Deverso, 518 F.3d 1250, 1257 (11th Cir. 2008) (affirming district court's rejection of mistake-of-age defense to § 2251(c)(1) liability). The sole circuit court reading a mistake-of-age defense into § 2251(a) is a pre-X-Citement Videos, Inc. case from the Ninth Circuit, which has found neither affirmation nor acceptance across the other courts who have considered the issue. See United States v. U.S. Dist. Ct., 858 F.2d 534, 538-43 (9th Cir. 1988). In that case, the court held that even though "[t]he defendant's awareness of the subject's minority is not an element of [a § 2251(a)] offense," the First Amendment requires reading a reasonable mistake-of-age affirmative defense into the statute. Id. at 538.

-31-

<u>Fortier</u>, 956 F.3d 563, 567 (8th Cir. 2020). The text of the statute is clear on this point. Congress imposed two mens rea requirements on the government when prosecuting a defendant under § 2251(a), the first relating to intent as to participation in an act and the second relating to intent to create a visual depiction of the act: "Any person who . . . uses . . . any minor to engage in, . . . with the <u>intent</u> that such minor engage in, any sexually explicit conduct for the <u>purpose</u> of producing any visual depiction of such conduct . . . shall be punished . . . ." 18 U.S.C. § 2251(a) (emphases added). Congress did not include a requirement that the defendant have knowledge of the victim's age, unlike other related statutes pertaining to receipt and distribution of child pornography. <u>See</u> <u>X-Citement Video, Inc.</u>, 513 U.S. at 76-77 (discussing legislative amendments to §§ 2251 and 2252); <u>cf.</u> 18 U.S.C. § 2252(a). We recognize that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." <u>County of San Francisco</u> v. <u>EPA</u>, 604 U.S. 334, 344 (2025) (quoting <u>Russello</u> v. <u>United States</u>, 464 U.S. 16, 23 (1983)).[7]

---

[7] Deschambault invokes <u>Ortiz-Graulau</u> v. <u>United States</u>, 756 F.3d 12 (1st Cir. 2014), arguing that we held that a defendant charged under § 2251(a) must "intentionally take sexually explicit photographs of a person he knew was a minor" to be found guilty of

Taken together, the text of the statute, our prior precedent, and persuasive precedent lead us to reiterate that there is no mistake-of-age defense available to defendants prosecuted under § 2251(a), and that, relatedly, a defendant need not know that the person engaging in the sexually explicit conduct is a minor. As a result, the district court did not abuse its discretion by excluding the proffered evidence relevant to Deschambault's belief regarding O.S.'s age.

**D. Jury Instructions on "Purpose"**

The fourth issue in this appeal relates to jury instructions as to the specific intent requirement in § 2251(a). As we have already noted, the statute requires the defendant to have acted with the "purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct." 18 U.S.C. § 2251(a). On appeal, Deschambault disputes two instructions the district court gave to the jury regarding the meaning of "purpose." First, he takes issue with the court's initial charge to the jury that the "purpose"

_____

the crime. He misreads our decision. We held that the "elements of § 2251(a) were met by [the defendant's] intentionally taking sexually explicit photographs of [a] person he knew was a minor" -- not that the elements of the statute could only have been met that way. Id. at 22 (emphasis added). This distinction is critical. A defendant's actual knowledge that his victim is a minor may be sufficient to uphold criminal liability, but such knowledge is not necessary to convict a defendant charged with this crime.

-33-

element of § 2251(a) could be satisfied so long as the defendant had "a significant purpose" of producing the depiction of the conduct. Second, he challenges the district court's response to a note from the jury regarding when the requisite purpose needed to be formed. We address each argument in turn.

### 1. Jury Instruction on Motive

At the charge conference, Deschambault first proposed that the court instruct the jury that, to find the "purpose" element satisfied, the jury must find that producing the image was "defendant's sole or dominant motive" for engaging in the sexual conduct. In support of his instruction, Deschambault relied on three cases: United States v. Palomino-Coronado, 805 F.3d 127, 130-31 (4th Cir. 2015); United States v. Torres, 894 F.3d 305, 312 (D.C. Cir. 2018); and United States v. McCauley, 983 F.3d 690, 695-97 (4th Cir. 2020). The government proposed that the court should instruct the jury that it need only find that "the defendant acted with the intent to create visual depictions of sexually explicit conduct and that the defendant knew the character and content of the visual depictions." This language replicated the Sixth Circuit Pattern Jury Instructions endorsed in Frei. 995 F.3d at 565.

After hearing from the parties, the district court indicated its intent to instruct the jury that "they have to find that a significant purpose or a significant motive of the sexual

-34-

encounter was the filming" in order to convict. This instruction largely accords with McCauley. See 983 F.3d at 695 ("[T]he language 'the purpose' requires that the filming be at the very least a significant purpose in the sexual conduct itself, not merely incidental." (emphasis omitted)). The court then permitted the parties to weigh in, at which time Deschambault's counsel admitted that he "shouldn't even have . . . requested" the instruction that the defendant's "sole" purpose was to produce a video of the sexual content, but proceeded to request the court amend its instruction to require that the defendant had "at least a significant motive" to produce the video. The court assented, agreeing to that language, and read the language back. Deschambault's counsel responded, "Perfect. Thank you very much." Now, on appeal, Deschambault claims the district court's instruction was erroneous, and that the district court should have instructed the jury that they had to find "a dominant motive of producing child pornography" rather than at least a "significant purpose" of doing so to find Deschambault guilty.

We need not resolve here whether § 2251(a) requires proof that production of the visual depiction was a "significant purpose," "significant motive," or "dominant motive" of the sexual conduct. Nor do we hold that district courts must give the "significant purpose" instruction used here in every § 2251(a) case. We hold only that Deschambault waived his argument that the

district court was required to instruct the jury that production of the visual depictions had to be his "dominant" motive, and that Deschambault did not demonstrate any plain error on appeal.

Deschambault waived his argument as to the jury instruction by agreeing to the district court's articulation of the instruction. We have previously held an "issue [to be] waived when a defendant intentionally relinquishes or abandons a legal right." United States v. Hansen, 434 F.3d 92, 101 (1st Cir. 2006). In Hansen, we held that the defense counsel's response "I am content" after a district court instructed the jury on an issue constituted an explicit withdrawal of the requested charge, thereby waiving the issue for appeal. Id. Deschambault's response to the district court -- "Perfect. Thank you very much." -- after the court read aloud the jury instruction, was, too, an "explicit withdrawal" of any purported objection to the jury instruction. See United States v. Pittmann, 157 F.4th 99, 106 (1st Cir. 2025) ("[W]e have previously found arguments of instructional error waived where, as here, the 'court invited edits' and counsel 'unambiguously signified approval of the . . . instructions as given.'" (omission in original) (quoting United States v. Simon, 12 F.4th 1, 61 (1st Cir. 2021))); United States v. Acevedo, 882 F.3d 251, 264 (1st Cir. 2018) (finding waiver when, upon district court's announcement of text of jury instruction, counsel stated he had "no objection"); United States v. Corbett, 870 F.3d 21, 31

-36-

(1st Cir. 2017) (similar, where counsel said "no problem"); see also United States v. Martínez-Mercado, 132 F.4th 61, 68 (1st Cir. 2025).

Even if we did not find Deschambault to have affirmatively withdrawn his requested instruction, we would nonetheless find that Deschambault waived the issue by failing to properly object under Rule 30(d) of the Federal Rules of Criminal Procedure and failing to address why he would be entitled to relief under a plain error standard of review.

The Federal Rules of Criminal Procedure require parties objecting to jury instructions to "inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d). In the jury instructions context, "[a] defendant's mere proposal of an alternate instruction does not satisfy Rule 30's standard of specificity." United States v. Peterson, 538 F.3d 1064, 1071 (9th Cir. 2008) (quoting United States v. Elias, 269 F.3d 1003, 1017-18 (9th Cir. 2001)). Our circuit has been "unflaggingly clear that to preserve a jury instruction objection, a litigant must lodge a specific objection and state the grounds for the objection after the court has charged the jury and before the jury begins deliberations, and that [o]bjections registered during pre-charge hearings are insufficient to preserve the issue." United States v. McPhail, 831 F.3d 1, 9 (1st Cir. 2016) (second emphasis added) (internal

quotation marks omitted) (quoting <u>United States</u> v. <u>Roberson</u>, 459 F.3d 39, 45 (1st Cir. 2006)).

Deschambault did not object to the court's instructions on "at least a significant purpose" at the sidebar after the jury had been charged but before they had retired to deliberate. Instead, he raised only objections relating the meaning of "specific intent" -- requesting that the district court instruct the jury that they must find that he acted with the purpose of violating the law -- rather than his current contention, namely, that the definition of "purpose" in the statute is one of "a dominant" motive rather than "at least a significant" one. So, even if we looked past the issue of waiver, Deschambault's "[f]ailure to object in accordance with" Rule 30(d) would nonetheless "preclude[] appellate review," except for plain error. Fed. R. Crim. P. 30(d), 52(b). Under this standard, the burden rests on the appellant to "make the difficult showing that the judge erred and clearly [or obviously] so, and that the error also affected [his] substantial rights." <u>United States</u> v. <u>Andino-Rodríguez</u>, 79 F.4th 7, 28 (1st Cir. 2023) (first alteration in original) (quoting <u>United States</u> v. <u>Cruz-Ramos</u>, 987 F.3d 27, 39 (1st Cir. 2021)). Deschambault made no such showing -- he did not discuss the plain error standard, let alone why he satisfies it, in his opening brief. <u>See</u> <u>Martínez-Mercado</u>, 132 F.4th at 68-69 ("A defendant on appeal waives a forfeited claim when 'his brief

-38-

fails to even mention plain error, let alone argue for its application.'" (quoting Cruz-Ramos, 987 F.3d at 40)). Accordingly, Deschambault has waived this argument on appeal.

### 2.    Jury Question on Timing of Intent

Deschambault next challenges the district court's response to a question from the jury during deliberations asking whether "intent ha[s] to exist prior to the sex act or can it be formed at any time during?"  The district court proposed to the parties the answer that "the intent does not have to exist prior to the sex act and may be formed during the act."  Defense counsel asked that the jury "just" be "read the instruction again that involves the elements of the crime."  The court disagreed, finding the jury's question to be a "legitimate" one which merited a response.  Defense counsel, again, renewed his request that the court define "specific intent" for the jury, and asked that the entire jury instruction be given again.

We conclude that Deschambault forfeited the argument he now makes on appeal, namely, that "the intent needed to be formed prior to the sex act."  See Reyes-Colón v. United States, 974 F.3d 56, 62 (1st Cir. 2020) (finding it an "insurmountable obstacle" that the plaintiffs "never made this argument in the district court").  Deschambault did not make that argument to the district court.  Instead, he expressly "agree[d] as a general principle that any kind of intent can be formed during the situation," while

-39-

also opaquely observing that "I think it's . . . more complicated than that."  In light of his failure to object with specificity to the instruction and his apparent agreement with the legal propriety of the instruction at trial, the issue was forfeited, if not waived entirely.  Hansen, 434 F.3d at 101.

Again applying the plain error standard, see Andino-Rodríguez, 79 F.4th at 28–29, we find no reason to reverse. § 2251(a) does not expressly address the temporal connection between the actus reus and mens rea.  While at least one court has expressed disagreement with the view that the requisite intent can arise at any point during the sexual conduct, it did so where the district court had failed to convey that the intent to create a visual depiction must be more than "a" purpose of the defendant. See McCauley, 983 F.3d at 697 (noting that the temporal instruction "compounded" the erroneous instruction that the intent to create a depiction need only be "a" purpose).  Where, as here, the court instructed the jury that the purpose to create a visual depiction must at least be significant, we do not think it is plain error to suggest that the intent can arise during the sexual activity.  The court's instructions, when considered as a whole, did not erase the specific intent mandate from the statute.  Cf. id.

E.  **Sufficiency of the Evidence**

Deschambault also argues that his conviction must be vacated because no rational jury could have found that he engaged

in sexually explicit conduct with O.S. for the purpose of creating child pornography. He argues that there is insufficient evidence to show that he engaged in sexual activities with O.S. with the purpose to produce the videos, and that the evidence only shows that the videos were spur-of-the-moment, incidental to the purpose of having sex, and for the purpose of "memorializ[ing]" their relationship. If these arguments sound familiar, it is because, in part, they are. To the extent that Deschambault seeks to challenge the jury instructions on "purpose," we reiterate that he waived his opportunity to do so. See Part D.1, supra. Thus, the only question left for us to decide is whether there was insufficient evidence for the jury to convict Deschambault based on the instructions as they were given.

We review the district court's decision on the motion for acquittal de novo. United States v. Freeman, 147 F.4th 1, 31 (1st Cir. 2025), cert. denied, 224 L. Ed. 2d 13 (Feb. 23, 2026). This review, however, is not intended to substitute the jury's conclusions with ours; instead, "the evidence, both direct and circumstantial," is viewed "in the light most favorable to the prosecution," such that a motion to acquit cannot be granted unless no "reasonable jury could find all the elements of the crime beyond a reasonable doubt." Id. (quoting United States v. Azubike, 564 F.3d 59, 64 (1st Cir. 2009)); see United States v. Pérez-Greaux, 83 F.4th 1, 23 (1st Cir. 2023) ("[R]eversal is warranted only if

we find that 'no levelheaded jury could have found [the defendant] guilty.'" (quoting United States v. Cortés-Cabán, 691 F.3d 1, 16 (1st Cir. 2012))). In conducting this inquiry, we emphasize that we may not "weigh[] the evidence or mak[e] credibility judgments" because those tasks are "solely within the jury's province." United States v. Díaz-Colón, 163 F.4th 1, 16 (1st Cir. 2025) (quoting United States v. Serunjogi, 767 F.3d 132, 139 (1st Cir. 2014)).

Because the "question is not whether 'no verdict other than a guilty verdict could sensibly be reached,' but only whether 'the guilty verdict finds support in a plausible rendition of the record,'" we conclude that there was sufficient evidence for the jury to convict. Id. (quoting United States v. Soler-Montalvo, 44 F.4th 1, 7 (1st Cir. 2022)). As the district court found, Deschambault seemed to be directing O.S. as to the things he wanted: "Stand up, sit down, do specific sexual acts. He tells her what he's going to do and she then complies." We agree with the district court that Deschambault's instructions to O.S. would allow the jury to "conclude that he is managing the video . . . the way a movie director would direct a movie shot." We acknowledge that Deschambault's statements directing O.S. to conduct specific sexual acts could be understood as "erotic banter," but they could also plausibly be understood by the jury as directions for O.S. to perform acts for the camera. See

-42-

Fortier, 956 F.3d at 567-68 (relying on instructions given as to positions); United States v. Morales-de Jesús, 372 F.3d 6, 21-22 (1st Cir. 2004) (citing, as supporting evidence, the fact that the defendant gave specific instructions regarding certain positions the defendant wanted the minor to assume relative to the camera). This conclusion -- evidently reached by the jury -- is fortified by the progression of the video: at times, the video pans across O.S.'s body, and at other times it focuses on specific parts of O.S.'s body relevant to the particular sexual activity ongoing. See Fortier, 956 F.3d at 567 ("extreme close-ups" of genitalia, with a focus on penetration, supported conviction); United States v. Ortiz-Graulau, 526 F.3d 16, 19 (1st Cir. 2008) (sexually explicit poses supported conviction). The statements and filmography together indicate that Deschambault acted as a "director" of the videos, and a jury could plausibly infer that he engaged in sex with "at least a significant" purpose of filming it.

Other evidence supports that inference. The government introduced two videos taken by Deschambault roughly eight hours apart, one recorded late in the evening and the other early the next morning, depicting two separate sexual encounters. See Morales-de Jesús, 372 F.3d at 22 (concluding that a reasonable jury could convict because the defendant "taped sexual encounters with the minor more than once"); Fortier, 956 F.3d at 568 (relying

on the creation of four videos "over the course of a single night" to support a sufficiency conclusion).  In the first video, which lasted about eight minutes, Deschambault was naked from the waist down, trained his phone camera on his own genitals, and then focused the camera on O.S.'s face while she performed oral sex on him.  In the second video, which lasted about three minutes, O.S. was nude on a mattress while Deschambault panned the camera across her body, directed its focus to her genital area, and then filmed he and O.S. engaging in penile-vaginal intercourse.[8]

On this record, a rational jury could readily reject Deschambault's contention that the videos were mere "afterthought[s]" to the sexual encounters.

We are not persuaded to the contrary simply because the facts in this case are different from facts in other cases upholding a jury verdict under § 2251(a).  See Morales-de Jesús, 372 F.3d at 22 (defendant lied about the camera recording and left the hotel room to retrieve the recording equipment);

_____

[8] O.S. also testified that she had only stayed at Deschambault's house "once or twice," only had sexual intercourse with Deschambault "[t]hree times]," and was involved in sexual activity with the defendant for a period of days, as they "didn't really know each other for a long period of time."  The fact that Deschambault recorded two videos during this time is telling. See United States v. Morales-de Jesús, 372 F.3d 6, 8 (1st Cir. 2004) (relating that the defendant had sex with minor on five occasions, of which two were videotaped).  Cf. United States v. Palomino-Cordero, 805 F.3d 127, 132 (4th Cir. 2015) (considering the fact that defendant had "engaged in sexual activity with [minor] over many months" and only produced one photo).

Ortiz-Graulau, 526 F.3d at 19 (a substantial number of pictures indicated evidence of purpose of taking pictures); see also United States v. Lebowitz, 676 F.3d 1000, 1013 (11th Cir. 2012) (defendant discussed with minor videotaping the encounter beforehand); United States v. Lee, 603 F.3d 904, 918 (11th Cir. 2010) (defendant discussed how many pictures of minors he wanted).  These cases explain the evidence which has been found sufficient to uphold a jury verdict; they do not suggest that the same evidence is necessary to do so.[9]  Deschambault's conviction can be upheld based on the facts presented in this case, because the facts plausibly support a guilty verdict.

## III.

Having concluded that Deschambault's arguments are unpersuasive, we **affirm**.

---

[9] The only case Deschambault identifies in which a court found insufficient evidence to convict is Palomino-Coronado, where there was "no testimony that Palomino-Coronado gave any instruction or direction to [the minor] as part of their sexual encounter that would indicate purpose" and where, despite a history of sexual conduct between the two, "only one photograph was taken [which was] subsequently deleted."  805 F.3d at 132.  The facts of this case are manifestly different, given Deschambault's directives to O.S. and the videos themselves.